**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gerald K. Smith, as Plan Trustee for and on behalf of the Estates of Boston Chicken, Inc., et al. | Case No.:  CV 01-0218-PHX-PGR<br>CV 01-0246-PHX-EHC<br>CV 02-1162-PHX-PGR<br>CV 02-1248-PHX-PGR<br>(Consolidated) |
| Plaintiff, | |
| vs. | **ORDER** |
| Arthur Andersen, et al., | |
| Defendants. | |

A Good Faith and Reasonableness Hearing having been held before this Court on the 6th day of February 2006, to determine whether the terms and conditions of the Settlement Agreement dated the 30th day of December 2005 ("Settlement Agreement") and a proposed Stipulated Judgment were reached in good faith and are fair, reasonable, and adequate for the settlement of claims asserted against Defendant Saad J. Nadhir ("Nadhir") in this Action by the Plaintiff as Plan Trustee ("Trustee") as authorized by the Debtor's Third Amended Chapter 11 Plan, dated May 3, 2000 in the jointly administered Chapter 11 bankruptcy cases of BCE West LP, Boston Chicken, Inc. ("BCI"), BC Real Estate Investments, Inc. and Affiliates (the "Debtors") identified as bankruptcy cases numbers 98-12547 ECF-CGC through 98-12570 ECF-CGC (collectively the "Bankruptcy Case"); notice having been mailed to all of the Other Defendants herein, the Insurers, and to the Third-Party Defendants

in this Action; the Court having considered all matters submitted to it, including the testimony of the Trustee, Defendant Nadhir, and Nadhir's counsel, Donald Bivens, as well as the Affidavit of Timothy J. Paris regarding Notice to Insurers; and all capitalized terms having the same meaning as set forth and defined in the Settlement Agreement, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.  Notice of the Good Faith and Reasonableness Hearing was given to the Insurers and to all those Defendants who were parties herein (the "Other Defendants"). The Notice was reasonable and apprised the Other Defendants and the Insurers of the pendency of the Settlement Agreement, the proposed Stipulated Judgment and the Approval and Bar Order and afforded them the opportunity to present objections or otherwise to be heard at the Good Faith and Reasonableness Hearing.

2.  The Insurers, despite having received adequate notice of this Good Faith and Reasonableness Hearing, declined to participate in the Hearing.

3. All Other Defendants in this Action have settled and compromised the claims made against them by the Trustee.

4.  Despite having received notice of this Good Faith and Reasonableness Hearing, none of the Other Defendants filed objection to the Settlement Agreement, to the proposed Stipulated Judgment, or to the Approval and Bar Order. The Underwriter Defendants appeared at the hearing through counsel, but made no objection to the Settlement Agreement, Approval and Bar Order or Stipulated Judgment.

5.  Gerald K. Smith has been the duly appointed Trustee for Boston Chicken and its affiliates since May 2000, having been appointed by Judge Charles G. Case of the United States Bankruptcy Court for the District of Arizona in May 2000.

6. The Trustee has acted as a court-appointed trustee previously and he has extensive experience in the area of bankruptcy law.

7.  The Trustee is well familiar with the facts and law pertaining to this Action, having interviewed many of the former employees of BCI, reviewed the company's books and records, and employed various professionals to assist him in gaining a full understanding of the history and ultimate failure of BCI.

8.  In February 2001, the Trustee, through his attorneys Beus Gilbert PLLC ("Beus Gilbert"), filed this Action and employed various experts to assist him in the preparation and presentation of his case, with the ultimate view of trying the Action in this Court.

9.  The Trustee employed the Michel Shaked Group and, specifically, Professor Allen Michel, a Professor of Finance at Boston University, to provide expert opinion with regard to the nature and extent of BCI's damages.

10.  Professor Michel opined that, based on a deepening insolvency damage analysis, BCI sustained damages, depending upon the particular defendant, in a range of $300 million to $830 million, exclusive of any calculation of pre-judgment interest or punitive damages.

11.  The Trustee is well familiar with the defenses advanced by the Defendants.

12.  Although the Trustee testified that there was some possibility that some of the defenses advanced in this Action may have resulted in no recovery after trial, he also expressed his opinion that his case was meritorious and that a recovery was anticipated by him at the conclusion of trial.

13.  The Trustee has settled with all Defendants in this Action for an aggregate amount in excess of $267 million.

14.  BCI's aggregate debt on the date it filed for bankruptcy protection in October 1998 was approximately $1.2 billion.

15.  The Trustee incurred expenses in the prosecution of this Action, including expert fees, in an amount between $8 million and $10 million.

16.  Beus Gilbert represented the Trustee on a contingent fee basis and Beus Gilbert's fee does not represent a portion of the expenses of $8-$10 million incurred by the Trustee.

17.  Based on his assessment of the evidence, the Trustee opined that the Defendants engaged in wrongful conduct with respect to BCI.

18.  The Trustee entered into settlement agreements with all of the directors and officers who were named as Defendants in this Action: Peer Pedersen, Mark Stephens, Scott Beck and Saad Nadhir. He received money from each of these individuals by way of settlement. In his opinion, all of them were culpable, in some measure, for the failure of BCI.

19.  With respect to Defendants Pedersen, Beck and Nadhir, the Trustee stipulated to Judgments with these Defendants in the amount of $30 million each. In connection with those Stipulated Judgments, the Trustee covenanted that he would not execute on the personal assets of those Defendants in return for their agreement to stipulate to the entry of the Judgments and to assign their rights in two BCI director and officer insurance policies written by Reliance Insurance Company ("Reliance") and ACE Bermuda Insurance, Ltd. ("ACE").

20.  The Trustee stated his opinion that each of the directors and officers named as Defendants in this Action contributed to the downfall of BCI and that their conduct was deceptive, or at least very negligent. These actions, the Trustee testified, resulted in driving BCI into insolvency and in making the company more deeply insolvent.

21.  BCI and the directors and officers of BCI had obtained at least seven layers of director and officer insurance ("D&O") coverage. The primary D&O insurance carrier, as well as the next four levels of excess D&O insurance acknowledged their obligations to defend and indemnity the director and officer Defendants, with the result that the policy limits of the first five layers of D&O insurance have been exhausted.

22. The sixth layer of coverage was provided by Reliance. Reliance filed for insolvency in the State of Pennsylvania in 2001 and has paid no amount of the $10 million of coverage available under that policy to the director and officer Defendants or to the Trustee as assignee of the directors and officers' rights under the Reliance policy.

– 4 –

23.  The remaining insurance carrier is ACE, whose policy provided $20 million of coverage for covered claims.

24.  Despite repeated demands by counsel for Beck and Pedersen, ACE refused to acknowledge any defense or indemnity obligations under their policy to either Beck or Pedersen.

25.  In June 2005, ACE agreed to pay some of Nadhir's defense costs incurred, in part, in the defense of this Action, pursuant to an "Interim Funding Agreement". Despite their agreement to pay some of Nadhir's defense costs, ACE did so subject to a reservation of rights, such that they continue to deny coverage under the ACE policy for the claims asserted in this Action against Nadhir.

26.  The Trustee never met or spoke with Nadhir prior to November, 2005, at which time the parties were engaged in settlement discussions.

27.  Nadhir was represented in settlement discussions, in part, by attorney Donald Bivens, and in part by attorney Stanley Feldman of Tucson, the former Chief Justice of the Arizona Supreme Court.

28. Prior to December 2005, at which time the Trustee executed his Settlement Agreement with Nadhir, the Trustee's attorneys vigorously pursued the Trustee's claims against Nadhir.

29.  Prior to December 2005, neither the Trustee nor his counsel had any sort of agreement or understanding with Nadhir.

30. Prior to the end of December 2005, the Trustee fully intended to pursue his claims against Nadhir through trial.

31.  The Settlement Agreement between Nadhir and the Trustee was negotiated at arms length.

32. At no point did the Trustee and Nadhir collude with one another during the course of this Action.

33. Nadhir contested his liability in this Action for nearly five years, and his attorneys vigorously pursued Nadhir's defense of this Action.

34. The Trustee owes fiduciary duties to the Estates of Boston Chicken. No one ever claimed that the Trustee violated his duties as a result of his settlement with Nadhir or with any of the Other Defendants in this Action.

35. The Trustee testified the settlement with Nadhir was entered into in good faith.

36. The Trustee testified there was no fraud or collusion in the Trustee's settlement with Nadhir.

37. The Trustee opined that the Settlement with Nadhir and the $30 million Stipulated Judgment were reasonable in view of the facts and the law governing the case.

38. Nadhir has been a Defendant in this Action for about five years, since early 2001.

39. Nadhir was an officer and director of BCI at various times during the period 1992 through 1998. For a time, he was also Chief Executive Officer and chairman of the BCI Board of Directors.

40. Nadhir was also a major shareholder of BCI, at one point owning as many as four million shares of BCI stock.

41. Nadhir gave deposition testimony in this Action over a period of about 8 days. During that deposition, Nadhir testified truthfully that he had made money off his Boston Chicken stock in 1997 in the approximate amount of $5 million.

42. Nadhir is also a lawyer, although he has not practiced law for several years. He is familiar with the allegations the Trustee made against him in this Action, having read the Second Amended Complaint, reviewed some of the discovery pertaining to him, and having frequently discussed his case with his attorneys.

43. Nadhir was aware that the Trustee sued him for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, acting in concert, negligent misrepresentation, fraudulent transfer and preferential transfer.

44. Nadhir was fully aware of the nature of the various defenses advanced on his behalf as well as of the evidentiary record supporting those defenses.

45. Throughout the litigation of this Action, Nadhir was represented by various attorneys, including Jenner & Block of Chicago, and Meyer, Hendricks & Bivens, by Donald Bivens and Paul Stoller. In addition, during the last year and a half, Nadhir has been represented by Stanley Feldman, primarily in connection with Nadhir's insurance claims and in connection with Nadhir's efforts to settle this Action.

46. In the aggregate, Nadhir has paid his attorneys, either directly or through reimbursements by various insurance carriers, more than $10 million.

47. Nadhir expressed his opinion that he had viable defenses in this Action, including the business judgment rule. He stated his opinion that he did not do anything intentionally wrong, and, at worse, acted only negligently with regard to his activities on behalf of BCI.

48. Nadhir was seriously concerned that, in view of the evidence developed by the Trustee against him, a jury might find him liable for damages in this Action.

49. Nadhir was fully aware of the extent of the Trustee's damage claims, and that the Trustee was seeking approximately one billion dollars in damages against him, before interest and before any punitive damages assessment.

50. Despite his opinion that he had viable defenses, Nadhir concluded he had to consider that, on the merits, there was a very real possibility that significant damages would be awarded against him by a jury.

51. At the time he settled with the Trustee, Nadhir was unable to pay even $2 million in damages.

52. Nadhir provided full financial information to the Trustee, or his counsel, in the summer or fall of 2005, in order to demonstrate to the Trustee his inability to pay a large sum by way of settlement.

53. Nadhir was unable to pay more than the $500,000 that he paid the Trustee by way of settlement.

54.  Under his Settlement Agreement with the Trustee, Nadhir is also obligated to execute a promissory note at a future point in time, representing the difference between $10 million – the Reliance policy limit – and the sum of those monies collected by the Trustee from or through Beck, Pedersen, Nadhir himself and Reliance.

55.  Based on his knowledge of the facts of the case, and on his knowledge of the evidence developed by the Trustee against him, as well as on the relative merits of his various defenses, if he had had the financial wherewithal to pay a $30 million judgment to the Trustee, Nadhir would seriously have considered paying that amount to the Trustee. The amount seemed reasonable to him in view of the total damage claim advanced by the Trustee.

56.  ACE has agreed to pay some of Nadhir's defense costs, and to date, has paid about $1,150,000 of those costs. ACE has made those defense payments to Nadhir, or to his counsel, subject to a reservation of rights enabling them to continue to challenge their obligation to provide coverage for Nadhir. If ACE successfully challenges its obligation to indemnify Nadhir against the claims advanced in this Action, ACE can stop paying Nadhir's defense costs immediately.

57.  If ACE had not agreed to reimburse Nadhir for the attorneys' fees he owed by mid-2005, Nadhir could not have continued his defense.

58.  Nadhir met the Trustee, and spoke to him for the first time, in November 2005. Prior to that time, Nadhir's attorneys, Donald Bivens and Stanley Feldman had had several discussions with the Trustee, or his counsel, regarding a settlement with Nadhir.

59.  Nadhir testified that Nadhir's settlement with the Trustee was negotiated at arm's length.

60.  Nadhir testified that Nadhir did not collude in any way with the Trustee before or during his time as a Defendant in this Action.

61.  Nadhir testified that Nadhir's attorneys did not collude with the Trustee or the Trustee's attorneys at any time during this case.

62. Nadhir was convinced that the Trustee fully intended to pursue his case against Nadhir through trial in this Action.

63. Nadhir testified that his settlement with the Trustee was entered into in good faith.

64. Throughout the time Nadhir has been in the case, the Trustee vigorously pursued his claims against Nadhir.

65. In Nadhir's opinion, the Settlement Agreement with the Trustee, and the Stipulated Judgment agreed to in connection with that settlement, are both fair and reasonable.

66. Attorney Donald Bivens ("Bivens") has represented Nadhir in this Action since May 2002.

67. Bivens was familiar with the pleadings filed in the case, with the allegations made by the Trustee and with the factual and legal bases of the various defenses advanced by Nadhir.

68. Bivens, and his colleague Paul Stoller, participated extensively in discovery during the Action. That participation included the review of documentation in the Action, the attendance, defense and taking of depositions, and attendance at Court hearings.

69. Bivens has been a member of the State Bar of Arizona for nearly 29 years, and, in 1998-1999 was President of the Arizona State Bar Association.

70. Bivens attended the deposition of Nadhir, occurring over the course of eight days, and defended Nadhir during that deposition.

71. Bivens also argued on behalf of Nadhir, various motions for summary judgment in the Action, none of which were successful

72. Based on his familiarity with the pleadings and the record in this Action, Bivens had sufficient knowledge of the case to enable him to provide advice to Nadhir regarding the wisdom of settling the action.

1    73.  Bivens was only peripherally involved in the settlement negotiations with the

2    Trustee, but did review drafts of the Settlement Agreement and reviewed the settlement

3    papers filed in connection with the Settlement Agreement.

4    74.  Although Bivens opined that Nadhir had various viable defenses in the Action,

5    including the imputation and business judgment rule defenses, he believed that if liability

6    were determined in the Action, a portion of that liability would be attributed to the officers

7    and directors of Boston Chicken who were named as Defendants. For this reason, there was

8    a substantial risk for Nadhir in litigating the merits of the case before a jury. If the jury were

9    to conclude that Nadhir had some measure of liability, the damages assessed against him

10    could be very extensive, in that the Trustee had asserted damages in excess of $800 million

11    on the Trustee's deepening insolvency theory, a damage theory accepted by this Court. In

12    view of these facts, Bivens opined that a determination by the jury that Nadhir was liable for

13    even a small portion of the damages would have had devastating effects on him.

14    75. Bivens was aware that the only remaining D&O insurance available to Nadhir is

15    available through the ACE policy, that ACE has agreed to pay some of Nadhir's defense

16    costs and that ACE has denied Nadhir coverage for this Action. ACE's agreement to pay

17    Nadhir's defense costs subject to a reservation of rights is a factor that Bivens would

18    consider in assessing the wisdom of Nadhir's decision to settle the Action.

19    76.  In view of the evidence developed by the Trustee in this Action regarding

20    Nadhir's potential liability, in view of the extent of the damages sought by the Trustee on a

21    Court-approved damage theory, in view of Bivens' assessment of Nadhir's proportionate

22    responsibility for any liability in this Action and in view of the viability of Nadhir's defenses,

23    a settlement by which Nadhir paid the Trustee $30 million would have been reasonable, had

24    Nadhir the financial ability to pay that amount.

25    77.  Bivens testified that the Trustee pursued his claims against Nadhir vigorously and

26    that both he and Mr. Stoller, on behalf of Nadhir, vigorously represented Nadhir in resisting

27    the Trustee's claims.

28                                          – 10 –

78.  According to Bivens, there was no collusion between the Trustee and Nadhir during the course of his representation of Nadhir and that, as far as he knew, the Settlement Agreement negotiated between Nadhir and the Trustee was negotiated at arm's length. There was no kind of agreement or understanding of any nature between Nadhir and the Trustee prior to their Settlement Agreement being executed.

79. There was no collusion between Bivens and the attorneys for the Trustee with respect to Nadhir's conduct of his defense of the case or the Trustee's prosecution of his case against Nadhir.

80. Nadhir always sincerely contested his liability in this Action.

81. The settlement entered into by Nadhir and the Trustee was executed in good faith, and there was no fraud or collusion in the settlement.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this Action and the Settlement Agreement.

2. Arizona law applies to the interpretation and effect of judgments entered in this Action. Restatement (Second) of Conflict of Laws, §§ 94-95.

3. A settlement agreement may be entered into between a claimant and an insured when the insurance carrier defends under a reservation of rights, under which the insured stipulates to a judgment, assigns his rights against the insurer to the claimant, and receives in return a covenant from the claimant not to execute against the insured. United Srvs. Auto Ass'n vs. Morris, 741 P.2d 246 (Ariz. 1987); Parking Concepts, Inc. v. Tenney, 83 P.3d 19, 20 (Ariz. 2004).

4. The Settlement Agreement entered into between Nadhir and the Trustee qualifies as a Morris agreement under Arizona law.

5.  In the context of a Morris agreement, "it is the absolute duty of the finder of fact to evaluate the evidence presented and determine what settlement amount the insured has

proved reasonable by a preponderance of the evidence." <u>Himes v. Safeway Ins. Co.</u>, 66 P.3d 74, 82 (Ariz. App. 2003).

6. Nadhir, as an insured under the ACE policy and defended by ACE under a reservation of rights, is entitled to enter into a settlement agreement with the Trustee without breaching the cooperation clause of the insurance policy. <u>Morris</u>, <u>supra</u>, 741 P.2d at 252-253.

7. In connection with a Morris agreement, the insurance carrier must receive appropriate notice and be afforded the opportunity to challenge the reasonableness of the settlement agreement and to demonstrate that the settlement agreement was the product of fraud or collusion. <u>Id.</u>

8. ACE, and its attorneys, received legally sufficient notice of the Trustee's Settlement Agreement with Nadhir and of the hearing held in this Court on February 6, 2006 concerning whether the Settlement Agreement and the Stipulated Judgment were entered into in good faith, were reasonable, and were not the product of fraud or collusion.

9. In order to prove that his settlement with the Trustee was reasonable, Nadhir and the Trustee were not required to establish that Nadhir would have lost the case advanced by the Trustee; Nadhir and the Trustee need only establish that, given the circumstances affecting liability, defense, and coverage, the settlement was reasonable. <u>Morris</u>, <u>supra</u>, 741 P.2d at 253; <u>Parking Concepts</u>, 83 P.3d 19 at 22.

10. The question as to whether a settlement is reasonable and prudent is what a reasonably prudent person in the insured's position would have settled for on the merits of the claimant's case. <u>Morris</u>, 741 P.2d at 254.

11. A reasonably prudent person is a person who has "the ability to pay a reasonable settlement amount from his or her own funds" and "makes a settlement decision as though the settlement amount came from those personal funds." <u>Parking Concepts</u>, 83 P.3d at 23, quoting <u>Himes</u>, 66 P.3d 74, 82.

12. Nadhir and the Trustee have established that given the circumstances affecting liability, defense and coverage, his Settlement Agreement with the Trustee was reasonable. Nadhir's Settlement Agreement with the Trustee and the Stipulated Judgment reflect what a reasonably prudent person in Nadhir's position would have settled for on the merits of the Trustee's case.

13. In light of the following conclusions, in the event that Nadhir and/or the Trustee establish that Nadhir was covered under the ACE policy, ACE may challenge neither the fact nor the amount of Nadhir's liability to the Trustee as reflected in the Stipulated Judgment. Parking Concepts, 83 P.3d at 22; Morris, 741 P.2d at 252-53.

14. The Trustee and his counsel conducted extensive investigation in this Action with respect to the nature and extent of Nadhir's liability. The Trustee and his counsel adequately prepared the Trustee's case for trial.

15. Had the Trustee gone to trial, he would have been allowed to proceed on a deepening insolvency damage theory. Under that theory, the Trustee produced credible expert opinion testimony that the range of the Trustee's damages were from a low of $300 million to a high of approximately $800 million, exclusive of interest and any assessment of punitive damages.

16. The Trustee's liability theories against Nadhir, including the theory of negligent misrepresentation, were legally meritorious.

17. There may have been some merit to Nadhir's primary defenses of imputation (in pari delicto) and the business judgment rule. However, on balance, Nadhir faced a substantial risk that the jury would find him liable under the Trustee's damage theories.

18. Nadhir would have confronted substantial risks and expenses in the event this Action proceeded to trial on the merits.

19. The Trustee's settlement with Nadhir was entered into in good faith.

1    20. The Trustee's settlement with Nadhir was not the product of collusion or fraud.

2    21. The Trustee's settlement with Nadhir and the proposed Stipulated Judgment are

3    reasonable.

4

5    Based upon the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY

6    ORDERED,

7    The Stipulated Judgment proposed by Nadhir and the Trustee will be signed and

8    entered on the Court's docket forthwith.

9    DATED this 9th day of February, 2006.

10

11                    Paul G. Rosenblatt
                      United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28